[Cite as *State ex rel. Webber v. Blue Ash Care Ctr.*, 2018-Ohio-978.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Veronica E. Webber, | : | |
| Relator, | : | |
| | : | No. 16AP-676 |
| v. | : | (REGULAR CALENDAR) |
| Blue Ash Care Center et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on March 15, 2018

**On brief:** *Lisa M. Clark,* for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Amanda B. Brown,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

LUPER SCHUSTER, J.

{¶ 1} Relator Veronica E. Webber initiated this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her application for permanent total disability ("PTD") compensation and to enter an order finding that she is entitled to that compensation.

{¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the appended decision, including findings of fact and conclusions of law. The magistrate determined that Webber has not demonstrated that the commission abused its discretion

in denying her application for PTD compensation.  Thus, the magistrate recommends this court deny Webber's request for a writ of mandamus.

{¶ 3}   Webber has filed objections to the magistrate's decision.  First, she challenges the magistrate's determination that the commission did not abuse its discretion in relying on psychologist Dr. Kenneth Manges' report as a basis to deny her request for PTD compensation.   Second, she contends the magistrate erroneously found that the commission did not abuse its discretion in considering the non-medical factors in connection with denying her request for PTD compensation.  The arguments Webber presents in support of these objections are essentially the same arguments that were presented to and rejected by the magistrate.

{¶ 4}   According to Webber, Dr. Manges' report contains a deficiency that precludes it from constituting some evidence upon which the commission could rely to deny her request for PTD compensation.  On an occupational activity assessment form, attached to his narrative report, Dr. Manges opined that Webber "is capable of work with the limitation(s)/modification(s) noted below." (Nov. 14, 2016 Joint Stipulation of Evidence at 20952-A24.)  In the space provided on the form, Dr. Manges handwrote: "minimal contact with public, difficulties speaking with supervisor, flexibility in time to allow for a slower pace and allow for short, simple tasks."  Webber argues that Dr. Manges' statement regarding her limitations was vague and ambiguous, necessarily requiring the commission to speculate as to the true nature of those limitations.  We disagree.  While Webber may have preferred more exacting language, Dr. Manges' statement articulates work limitations with reasonable precision.  Thus, we agree with the magistrate's rejection of Webber's argument that Dr. Manges' report was so flawed that the commission committed an abuse of discretion by relying on it to deny her PTD compensation.

{¶ 5}   Webber also argues the commission did not adequately consider all of the limitations set forth by Dr. Manges, and, even if it did consider all of the limitations, it did not explain why it did not accept all of them.  In particular, Webber asserts that the commission ignored or rejected Dr. Manges' opinion that she would require flexibility in time to allow for a slower pace.  She bases this assertion on the fact that the commission's order does not expressly refer to Dr. Manges' statement that Webber must have "flexibility in time to allow for a slower pace."  Webber asserts that this limitation arguably would

interfere with her ability to perform sustained remunerative work.  Webber reasons that the commission's failure to either consider this limitation or explain why the limitation finding was rejected fatally flawed the commission's order.

{¶ 6}  However, the commission's omission of an express reference to that limitation in its order denying PTD compensation does not mean the commission did not consider it or that it rejected that finding.  The commission expressly found that Webber retains the functional capacity to perform sustained remunerative employment when the impairments arising out of the allowed conditions are considered.  Thus, it viewed that limitation as not constituting a barrier to Webber performing sustained remunerative employment.  We therefore agree with the magistrate's finding that the fact that the commission did not expressly reference this limitation in its order denying Webber's request for PTD compensation did not fatally flaw the commission's reliance on Dr. Manges' report and the attached assessment.

{¶ 7}  Lastly, we reject Webber's argument that the commission improperly addressed non-medical factors relating to her ability to work.  Generally, in determining a claimant's ability to do any sustained remunerative employment, the commission must consider not only medical impairments but also the claimant's age, education, work record and other relevant non-medical factors.  *State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167 (1987).  Thus, a claimant's medical capacity to work is not dispositive if the claimant's non-medical factors foreclose employability.  *State ex rel. Gay v. Mihm*, 68 Ohio St.3d 315 (1994).  Webber asserts that, based on Dr. Manges' assessment that she is limited to "short, simple tasks," her industrial injury limits her to "unskilled work," which requires "little or no judgment to do simple duties that can be learned on the job in a short period of time."  Ohio Adm.Code 4121-3-34(B)(3)(c)(i).  Webber argues that the commission abused its discretion in finding her age, education, and work history all to be vocational assets that enhance her ability to obtain and perform sustained remunerative employment.  She contends that each of these factors is either inconsequential or irrelevant to her reemployment prospects.

{¶ 8}  However, as the magistrate explained, even assuming Webber's residual functional capacity limits her to unskilled labor, these non-medical factors are relevant to her ability to acquire and learn to do an unskilled job.  While unskilled work only requires

the performance of simple duties, such work may require some, albeit minimal, vocational preparation and judgment.  Thus, it was not unreasonable for the commission to view Webber's non-medical factors as positive vocational assets even assuming she is only capable of unskilled work.

{¶ 9}   For these reasons, and the reasons expressed in the magistrate's decision, we find that Webber's objections lack merit.

{¶ 10}  Following our independent review of the record pursuant to Civ.R. 53, we find the magistrate correctly determined that Webber is not entitled to the requested writ of mandamus.   The magistrate properly applied the pertinent law to the salient facts. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.  We therefore overrule Webber's objections to the magistrate's decision and deny her request for a writ of mandamus.

*Objections overruled;*
*writ of mandamus denied.*

SADLER and DORRIAN, JJ., concur.

————————————

## APPENDIX

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Veronica E. Webber, | : | |
| Relator, | : | |
| v. | : | No. 16AP-676 |
| Blue Ash Care Center, et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

### M A G I S T R A T E ' S   D E C I S I O N
### NUNC PRO TUNC[1]

**Rendered on September 18, 2017**

*Lisa M. Clark,* for relator.

*Michael DeWine*, Attorney General, and *Amanda B. Brown,* for respondent Industrial Commission of Ohio.

### IN MANDAMUS

{¶ 11} In this original action, relator, Veronica E. Webber, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the June 28, 2016 order of its staff hearing officer ("SHO") that denied relator's application for permanent total disability ("PTD") compensation, and to enter an order granting the compensation.

---

[1] This magistrate's decision replaces, nunc pro tunc, the original magistrate's decision released September 13, 2017 to reflect the correct counsel of record for the Industrial Commission of Ohio.

Findings of Fact:

{¶ 12} 1. On October 16, 2005, relator injured her lower back while employed by respondent Blue Ash Care Center in housekeeping/laundry. Respondent is a state-fund employer.

{¶ 13} 2. On October 16, 2005, relator completed a form provided by the Ohio Bureau of Workers' Compensation ("bureau") that is captioned "First Report of an Injury, Occupational Disease or Death." The bureau designates the form as a "FROI-1." On the form, the applicant is asked to describe the accident. In the space provided, relator wrote:

> I picked up a heavy laundry bag out of barrel and the bag broke and I came up quick and I felt this pain like someone hit me across my back.

{¶ 14} 3. The industrial claim (No. 05-401588) is allowed for:

> Lumbar strain; aggravation of pre-existing spondylolisthesis at L5-S1 and aggravation of pre-existing degenerative disc disease at L5-S1; aggravation of pre-existing pseudoarthrosis L5-S1; postlaminectomy syndrome lumbar; depressive disorder; pain disorder associated with both a general medical condition and psychological factors.

{¶ 15} 4. In November 2013, relator began psychotherapy for her depressive symptoms. The psychotherapy was performed by psychologist William C. Melchior, Ed.D.

{¶ 16} 5. On December 21, 2015, Dr. Melchior wrote to relator's counsel. In his three-page narrative report, Dr. Melchior states:

> In summary, Ms. Webber is a 40 year old woman with significant psychological limitations due to her industrial injuries. Unfortunately, as noted above, Ms. Webber has significant limitation in her work functioning based on her allowed psychological conditions including impairment in stress tolerance, cognitive functioning, social functioning, and endurance/pace. I don't expect any further psychological improvement and am recommending permanent total disability.
>
> I will continue to see her on a bi-weekly/monthly basis to maintain treatment gains and prevent further relapse.

{¶ 17} 6. On January 22, 2016, relator filed an application for PTD compensation. In support, relator submitted the December 21, 2015 report of Dr. Melchior.

{¶ 18} 7. On March 1, 2016, at the commission's request, relator was examined by psychologist Kenneth J. Manges, Ph.D. In his seven-page narrative report, Dr. Manges states:

> **Mental Status Exam**
>
> **Attitude**
>
> She was cooperative during the interview. She reports having feelings of helplessness and hopelessness. She related to this examiner in a depressed manner. She had no difficulty in keeping a train of thought during the interview.
>
> She is anxious about the way her life has turned out and reports "I feel sorry for myself."
>
> She reports others say she worries too much and she too believes her worry is excessive at times.
>
> She was able to do a serial 3 subtraction task. She was able to do a mental computation addition, subtraction, addition [sic] and division problem without difficulty. She [is] able to recite her ABC's without difficulty. She was able to spell a common word forward and backward. She was able to remember the name of this examiner some twenty minutes after being introduced. She knew the date of the month and the day of the week. She knew the address of the location where the testing took place. She was only able to recall the current and one of the two most recent past Presidents of the United States. She had a good short term memory. She was able to recall four of four items after fifteen minutes with no prompts.
>
> **Mood and Affect:**
>
> Ms. Webber's mood was characterized by depression. She did not evidence any PTSD symptoms. She denies any OCD symptoms/features.
>
> She reports a phobia for closed spaces.
>
> **Speech:**

Her speech was not atypical in rate, rhythm or tone. She did not stutter, she did not have any articulation problems. She spoke clearly and fluently. She had no difficulty carrying out a conversation.

**Perceptual Disturbances**

There was a denial of any auditory or visual hallucinations.

**Thought Processes**

Her thought processes were focused on her injuries. She was logical and coherent.

**Thought Content**

Thought content was relevant to the focus of the interview.

**Cognition**

Her cognitive functioning appeared grossly within normal limits and suggested an average intelligence.

**Insight and Judgment**

Her insight was adequate as evidenced by her response to the questions listed below. When asked "What would you do if you won the lottery?" She said "Pay off my bills."

When asked "What are you most proud of?" She said "My children."

When asked "Do you have any major regrets?" She said "None."

When asked "If you could change one thing about your life, what would it be?" She said "My weight."

When asked "Do you make good decisions?" She said "Yes." When asked to give an example she said "Getting married."

\* \* \*

**Multiaxial Diagnosis**

Depressive disorder; pain disorder with general medical conditions and psychological factors. No personality disorder. Medical conditions allowed in the claim and scoliosis. Occupational, financial and accommodation problems. GAF 60 moderate symptoms.

**Opinions**

Question # 1. If you believe the injured worker is still at maximum medical improvement, based on the AMA Guides, second and fifth edition, and with reference to the Industrial Commission Manual, provide the estimated whole person impairment arising from the psychological/psychiatric condition. Provide the class and percentage of impairment due to the allowed psychological/psychiatric condition in each of the four functional areas, and then provide the percentage of whole person impairment. If there is no impairment for an allowed condition indicate a zero percentage.

**Answer: Yes. The [Injured Worker] is still MMI. Although she continues to participate in outpatient treatment she has achieved psychological stability and no additional treatment would realistically significantly change her psychological condition.**

**Answer: The [Injured Worker] demonstrates a Class 3 moderate whole person psychological impairment of 25% which is compatible with some but not all useful functioning as a direct and proximate result of her BWC injury #05-401588.**

**Activities of Daily Living: 25% impairment level which is compatible with some but not all useful functioning for example, she avoids taking on any new challenges and is distracted by her inability to work or enjoy recreational pastimes as she had pre injury. Other family members do the household chores.**

**Social Functioning: 20% impairment level are compatible with most useful functioning. For example, she continues to meet with friends on a monthly basis but avoids crowds, or taking on new challenges.**

> **Concentration: 20% impairment. Levels are compatible with most useful functioning as she was able to recall 4 out of 4 items, after 15 minutes but she was only able to name two of the last three presidents and had difficulty with a serial subtraction 7 task.**
>
> **Adaptation: 20% impairment. Levels are compatible with most useful functioning. For example, although she [is] preoccupied with her pain she is still able to make every day decisions and problem solve as well as socialize on a routine basis.**

(Emphasis sic.)

{¶ 19} 8. On March 15, 2016, Dr. Manges completed a form provided by the commission captioned "Occupational Activity Assessment, Mental & Behavioral Examination."

{¶ 20} On the form, Dr. Manges indicated by his mark "[t]his Injured Worker is capable of work with the limitation(s)/modification(s) noted below."

{¶ 21} In the space provided, Dr. Manges wrote in his hand as follows:

> Minimal contact with public, difficulties speaking with supervisor, flexibility in time to allow for a slower pace and allow for short, simple tasks.

{¶ 22} 9. On April 7, 2016, at the commission's request, relator was examined by Steven S. Wunder, M.D. In his four-page narrative report, Dr. Wunder wrote:

> Physical examination revealed her to be a well-developed and well-nourished, overweight female in no acute distress. She was about 5 feet, 6 inches in height and weighed 276 pounds with a body mass index of about 45. In the pain management records from Dr. Klickovich, it was noted that her BMI was 44. (The examination was chaperoned by her mother.) She was independent with sit to stand. She ambulated without antalgia. Tandem walking was intact. She could stand on her heels and toes.
>
> Inspection of the spine revealed a 19-cm scar. She had diffuse, superficial tenderness to palpation around the back area. She also had some accelerated pain with axial compression and rotation, which are nonorganic findings.

She had nonorganic findings on checking range of motion with 30 degrees of a lumbar flexion angle and 90 degrees of a straight leg raise. Extension was 10 degrees and lateral bending was 10 degrees.

She was able to independently ascend and descend the exam table, without assistance.

Neurologically, her reflexes were 1+ and symmetric at the patellar tendon and 2+ and symmetric at the Achilles tendon. Sensation was decreased over the right and left lateral thighs. Her motor strength was normal.
Her thigh circumferences were symmetric at 53 cm. The calf circumferences were 42 cm on the right and 43.5 cm on the left with the difference being a larger varicose vein on the left side compared to the right.

She had normal motion of the ankles and knees. She complained of some low back pain with hip range of motion.

{¶ 23} 10. On April 7, 2016, Dr. Wunder completed a commission form captioned "Physical Strength Rating." On the form, Dr. Wunder indicated by his mark that relator is capable of "light work."

{¶ 24} 11. Following a June 28, 2016 hearing, an SHO issued an order denying the PTD application. The order explains:

After full consideration of the issue, it is the order of the Staff Hearing Officer that the Injured Worker's IC-2 Application for Permanent Total Disability Compensation, filed 01/22/2016, be denied.

The Injured Worker is a 40-year-old female who has one Workers' Compensation claim. This claim, claim number 05-401588, is predicated upon an industrial accident which occurred on 10/16/2005 when the Injured Worker injured her low back while lifting a laundry bag out of a barrel. This claim also has a psychological component.

Steven Wunder, M.D., examined the Injured Worker on 04/07/2016 at the request of the Industrial Commission. Dr. Wunder examined the Injured Worker on the allowed physical conditions and concludes that the allowed physical conditions have reached maximum medical improvement.

Dr. Wunder further opines that the Injured Worker retains the functional capacity to perform light work when the impairments arising from the allowed physical conditions are considered. Light work includes the ability to exert 20 pounds of force one-third of the time, 10 pounds of force two-thirds of the time, and negligible force constantly. Light work may also include jobs which require walking or standing to a significant degree and jobs which require working at a production rate.

Kenneth Manges, Ph.D., examined the Injured Worker on 03/01/2016 at the request of the Industrial Commission. Dr. Manges examined the Injured Worker on the allowed psychological conditions and concludes that the allowed psychological conditions have reached maximum medical improvement.

Dr. Manges further opines that the Injured Worker is capable of performing sustained remunerative employment when the impairments arising out of the allowed psychological conditions are considered. Dr. Manges does indicate that the Injured Worker would be limited to positions with minimal contact with the public and jobs which contain simple and repetitive tasks. Dr. Manges also indicates that the Injured Worker would have difficulty talking to a supervisor.

Based upon the reports of Dr. Wunder and Dr. Manges, the Staff Hearing Officer finds that all allowed conditions have reached maximum medical improvement.

The Staff Hearing Officer further finds, based upon the reports of Dr. Wunder and Dr. Manges, that the Injured Worker retains the functional capacity to perform sustained remunerative employment when the impairments arising out of the allowed conditions are considered.

Additionally, when the Injured Worker's impairments arising out of the allowed conditions are considered in conjunction with the Injured Worker's non-medical disability factors, the Staff Hearing Officer finds that the Injured Worker retains the functional capacity to perform sustained remunerative employment and is therefore not permanently totally disabled.

The Staff Hearing Officer finds that the Injured Worker's age, 40 years old, does not constitute a barrier to re-employment. Individuals of the Injured Worker's age expect to remain in

the workforce for a number of years. Further, individuals of the Injured Worker's age have the opportunity, through vocational training or on-the-job training, to acquire new job skills which may enhance their ability to gain re-employment. Accordingly, the Staff Hearing Officer finds that the Injured Worker's age constitutes a positive vocational asset.

The Staff Hearing Officer finds that the Injured Worker is a high school graduate who has also completed one year of college course work at Cincinnati State University in graphic design. The Staff Hearing Officer finds that the Injured Worker's educational history demonstrates that the Injured Worker can read, write, and perform basic math skills, as would be expected of an individual with the Injured Worker's level of formal education. Further, a high school diploma ordinarily qualifies the Injured Worker for semi-skilled to skilled employment. See Ohio Adm.Code 4121-3-34(B)(3)(b)(iv). Accordingly, the Staff Hearing Officer finds that the Injured Worker's educational history constitutes a positive vocational asset which enhances the Injured Worker's ability to gain re-employment.

The Staff Hearing Officer finds that the Injured Worker's IC-2 application indicates that the Injured Worker has a limited work history. Specifically, the Injured Worker previously worked for 12 years as a housekeeping and laundry supervisor. Additionally, the Injured Worker spent one year working as a cashier and press catcher.

As a housekeeping and laundry supervisor, the Injured Worker was responsible for supervising seven employees. The Injured Worker utilized basic computer skills in order to manage employees' schedules and maintain cleaning supply inventory. The Injured Worker was responsible for ordering supplies and preparing written reports concerning various incidents at work. The Injured Worker was responsible for the completion of jobs in a timely and satisfactory manner. The Injured Worker's IC-2 application indicates that the Injured Worker prepared all paperwork. Further, the Injured Worker was responsible for overseeing and training seven employees. The Injured Worker acquired the skills to perform this job through on the job training.

Although the Injured Worker's job history is limited, the Staff Hearing Officer finds that this job history demonstrates that the Injured Worker has the ability to successfully acquire new

job skills through on-the-job training. Further, this job history demonstrates that the Injured Worker has the ability to supervise co-workers, manage a job site, manage inventory, utilize a computer, and prepare paperwork.

Therefore, the Staff Hearing Officer finds that the Injured Worker's prior work history demonstrates that the Injured Worker has the transferable skills, such as the ability to prepare paperwork, manage co-workers, manage a job site, use a computer, and learn from on-the-job training, necessary to perform sustained remunerative employment.

Accordingly, the Staff Hearing Officer finds that the Injured Worker's prior work history constitutes a positive vocational asset which enhances the Injured Worker's ability to gain re-employment.

Based upon these facts, the Staff Hearing Officer finds that the Injured Worker has the vocational ability, intellect, and literacy ability necessary to perform sustained remunerative employment.

Further, when the Injured Worker's non-medical disability factors are considered in conjunction with the impairments arising out of the allowed conditions, the Staff Hearing Officer finds that the Injured Worker retains the functional capacity to perform sustained remunerative employment and is therefore not permanently and totally disabled.

Accordingly, the Injured Worker's IC-2 Application for Permanent Total Disability Compensation, filed 01/22/2016, is denied.

This order is based upon the report of Dr. Wunder dated 04/07/2016, the report of Dr. Manges dated 03/15/2016, and the non-medical disability factors.

{¶ 25} 12. On September 26, 2016, relator, Veronica E. Webber, filed this mandamus action.

Conclusions of Law:

{¶ 26} Two issues are presented:  (1) whether the reports of Dr. Manges provide the commission with some evidence on which it relied in determining residual functional

capacity, and (2) whether the commission abused its discretion in considering the non-medical factors.

{¶ 27} The magistrate finds: (1) the reports of Dr. Manges provide the commission with some evidence on which it relied in determining residual functional capacity, and (2) the commission did not abuse its discretion in considering the non-medical factors.

{¶ 28} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

### First Issue: Dr. Manges' Report

{¶ 29} As earlier noted, in completing the Occupational Activity Assessment, Mental & Behavioral Examination, Dr. Manges indicates by his mark "[t]his Injured Worker is capable of work with the limitation(s)/modification(s) noted below." In the space provided, Dr. Manges wrote in his own hand:

> Minimal contact with public, difficulties speaking with supervisor, flexibility in time to allow for a slower pace and allow for short, simple tasks.

{¶ 30} Relator's challenge to Dr. Manges' report is focused on his handwritten statements in response to the pre-printed request that he provide "the limitation(s)/modification(s)."

{¶ 31} In her brief, relator criticizes Dr. Manges' response to the form's query regarding "limitation(s)/modification(s):"

> On the Occupational Activity Assessment form he does try to indicate limitations/modifications she is capable of working within, but some such as "difficulties speaking with supervisors" is not a limitation. For example he could have said minimal contact with supervisors or no contact with supervisors, or minimal superficial contact with supervisors.
>
> In addition, qualified flexibility in time to allow for a slower pace is not a specific limitation for example he could say no production quotas and/or requirement of additional breaks. Reading in to what Dr. Manges means by these would be pure speculation. Due to the deficiencies in Dr. Manges' report, it cannot constitute some evidence to be relied upon by the Industrial Commission.

(Relator's brief at 11-12.)

{¶ 32} The magistrate disagrees with relator's assertion that Dr. Manges' response constitutes such deficiency that the report cannot provide some evidence supporting the commission's determination of residual functional capacity.   Ohio Adm.Code 4121-3-34(B)(4).

{¶ 33} Contrary to relator's assertion, "difficulties speaking with supervisors" can be viewed as a work limitation such that any employment she may obtain must allow for her speaking difficulty.

{¶ 34} Contrary to relator's assertion, "flexibility in time to allow for a slower pace" is indeed a limitation on relator's ability to work or to find employment.  (Relator's brief at 12.)   Relator's stated preference for different language does not create a flaw in Dr. Manges' report.  Relator's assertion that Dr. Manges invites "pure speculation" is simply incorrect.  (Relator's brief at 12.)

{¶ 35} Moreover, the magistrate disagrees with relator's assertion that the SHO "did not seem to understand Mr. Manges' Occupational Activity Assessment."  (Relator's brief at 12.)

{¶ 36} While the SHO did not repeat verbatim Dr. Manges' stated limitations, it was not necessary that the SHO do so.  That the SHO failed to repeat Dr. Manges' statement "flexibility in time to allow for a slower pace" does not fatally flaw the SHO's reliance on Dr. Manges' Occupational Activity Assessment.

{¶ 37} In her reply brief, relator relies on this court's decision in *State ex rel. Watkins v. St. Clare Retirement Comm.,* 10th Dist. No. 15AP-175, 2016-Ohio-3136. Relator's reliance on *Watkins* is misplaced.

{¶ 38} Gwendolyn Watkins sustained a work-related injury in June 1993 while employed as a nurse's aide for St. Clare Retirement Community.  Her industrial claim is allowed for multiple physical conditions and a "depressive mood disorder."  *Watkins* at ¶ 8.

{¶ 39} On February 28, 2014, Watkins filed an application for PTD compensation. *Id.* at ¶ 9.  On September 9, 2014, at the commission's request, Watkins was examined by Dr. Manges who then issued a narrative report.  *Id.* at ¶ 12.

{¶ 40} In his report, Dr. Manges opined that Watkins "demonstrates a Class 3 moderate whole person psychological impairment of 35%." *Id.* Dr. Manges further opined as to Watkins' percentage of impairments as they relate to activities of daily living, social functioning, concentration and adaptation. *Id.*

{¶ 41} Dr. Manges also completed an Occupational Activity Assessment form for Watkins. *Id.* at ¶ 13.

{¶ 42} On the form, Dr. Manges indicated that Watkins was capable of performing work within the limitations/modifications noted in his attached report. *Id.* Apparently, Dr. Manges did not identify specific limitations in the space provided on the Occupational Activity Assessment form. *Id.*

{¶ 43} Following a November 12, 2014 hearing, an SHO issued an order that denied Watkins' PTD application. In determining residual functional capacity, the SHO relied on Dr. Manges' report regarding the psychological claim allowance.

{¶ 44} Watkins then filed in this court a complaint for a writ of mandamus. In granting the writ, this court determined that Dr. Manges' report did not constitute some evidence on which the commission could rely.

{¶ 45} In *Watkins*, this court explained:

> The magistrate found that the commission abused its discretion when it relied on the psychological report of Dr. Manges because Dr. Manges indicated that relator was capable of work with certain limitations but then failed to identify those limitations in his report. Because Dr. Manges did not identify the applicable limitations, his report did not constitute some evidence upon which the commission could rely. Therefore, the magistrate has recommended that we grant a writ of mandamus and order the commission to vacate its order that denied relator's application for PTD and, after either receiving an addendum report from Dr. Manges or having relator examined by another examiner, determine whether or not she is entitled to said compensation.

*Id.* at ¶ 1.

{¶ 46} Clearly, the *Watkins* case does not support relator's request for a writ of mandamus here.

{¶ 47} Unlike Dr. Manges' Occupational Activity Assessment in the instant case, Dr. Manges provided no other response in the *Watkins* case than a reference to his narrative report. Thus, relator's reliance on the *Watkins* case is misplaced.

{¶ 48} Based on the above analysis, the magistrate concludes that the reports of Dr. Manges provide the commission with some evidence to support its determination of residual functional capacity.

## Second Issue: Non-Medical Factors

{¶ 49} Ohio Adm.Code 4121-3-34 sets forth the commission's rules applicable to all applications for PTD compensation.

{¶ 50} Ohio Adm.Code 4121-3-34(B) sets forth definitions.

{¶ 51} Ohio Adm.Code 4121-3-34(B)(3) sets forth "Vocational factors."

{¶ 52} Ohio Adm.Code 4121-3-34(B)(3)(b)(iv) provides:

> "High school education or above" means twelfth grade level or above. The G.E.D. is equivalent to high school education. High school education or above means ability in reasoning, arithmetic, and language skills acquired through formal schooling at twelfth grade education or above. Generally an individual with these educational abilities can perform semi-skilled through skilled work.

{¶ 53} Ohio Adm.Code 4121-3-34(B)(3)(c) is captioned "Work experience." Thereunder, the rule provides:

> (i) "Unskilled work" is work that needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. Jobs are unskilled if the primary work duties are handling, feeding, and off bearing (placing or removing materials from machines which are automatic or operated by others), or machine tending and a person can usually learn to do the job in thirty days and little specific vocational preparation and judgment are needed.
>
> (ii) "Semi-skilled work" is work that needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require close attention to watching machine processes or inspecting, testing, or otherwise looking for irregularities or tending or guarding equipment, property, material, or persons against loss, damage, or injury and other types of activities which are similarly less complex than skilled

work but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly in a repetitive task.

(iii) "Skilled work" is work that requires qualifications in which a person uses judgment or involves dealing with people, factors or figures or substantial ideas at a high level of complexity. Skilled work may require qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity to be produced. Skilled work may require laying out work, estimating quality, determine the suitability and needed quantities of materials, making precise measurements, reading blue prints or other specifications, or making necessary computations or mechanical adjustments or control or regulate the work.

{¶ 54} Ohio Adm.Code 4121-3-34(D) sets forth the commission's guidelines for adjudication of PTD compensation.

{¶ 55} Ohio Adm.Code 4121-3-34(D)(2) provides:

(b) If, after hearing, the adjudicator finds that the injured worker, based on the medical impairment resulting from the allowed conditions is unable to return to the former position of employment but may be able to engage in sustained remunerative employment, the non-medical factors shall be considered by the adjudicator.

The non-medical factors that are to be reviewed are the injured worker's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the injured worker may return to the job market by using past employment skills or those skills which may be reasonably developed. (Vocational factors are defined in paragraph (B) of this rule).

(c) If, after hearing and review of relevant vocational evidence and non-medical disability factors, as described in paragraph (D)(2)(b) of this rule the adjudicator finds that the injured worker can return to sustained remunerative employment by using past employment skills or those skills which may be reasonably developed through retraining or through

> rehabilitation, the injured worker shall be found not to be permanently and totally disabled.

{¶ 56} Citing Ohio Adm.Code 4121-3-34(B)(3)(c)(i), relator asserts that she is limited by her industrial injury to unskilled work that, by definition, requires "little or no judgment to do simple duties that can be learned on the job in a short period of time."

{¶ 57} Apparently, relator's assertion is drawn from Dr. Manges' Occupational Activity Assessment on which he indicated that relator's allowed psychological conditions restrict her to "short, simple tasks."

{¶ 58} Relator asserts that the SHO abused his discretion in determining that individuals of relator's age have the opportunity, through vocational training or on-the-job training, to acquire new job skills which may enhance their ability to gain re-employment. According to relator, because she is limited by her psychological injury to unskilled work, "her age and ability to acquire new skills is not relevant." (Relator's brief at 16.) The magistrate disagrees.

{¶ 59} As the commission here points out, even if relator's residual functional capacity may limit her to unskilled labor, age is indeed relevant to the commission's analysis of whether relator can learn to do an unskilled job. As the commission further points out, "[e]ven in an unskilled position, an individual would have the need to be able to learn new job duties." (Commission's brief at 14.)

{¶ 60} Relator further asserts that the SHO abused his discretion in determining that her high school education "constitutes a positive vocational asset which enhances [relator's] ability to gain re-employment." While the SHO did point out that a high school diploma, by definition, qualifies the injured worker for semi-skilled to skilled employment, this need not be interpreted as a commission finding that relator is currently qualified for semi-skilled to skilled employment. Even if relator is limited to unskilled work, her high school education gives her some advantage over a similarly situated applicant who lacks a high school education. Therefore, relator is incorrect in asserting that her high school education is irrelevant.

{¶ 61} Relator further asserts that the SHO abused his discretion in determining that her work history gives her "the ability to successfully acquire new job skills through on-the-job training." The SHO pointed to relator's prior work supervising seven

employees and her utilization of basic computer skills in order to manage the employees' schedules and maintain cleaning supply inventory.

{¶ 62} Even if relator is currently limited to unskilled work, the commission's discussion of her work history is not irrelevant, as relator asserts.  Even if relator is currently limited to unskilled work, her work history can be viewed as a "positive vocational asset."

{¶ 63} In short, based on the above analysis, the magistrate finds that the commission did not abuse its discretion in its consideration of the non-medical factors.

{¶ 64}  Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.


/S/ MAGISTRATE
KENNETH W. MACKE



**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).